OSCAR EDDY v. JOHN B. ST. MARS.*

*Adverse Possession.  Artificial Power.  Alluvion.*

1.  When there is a gradual subsidence of the water in a mill pond, because of the want of repair of the dam, and the owner of a pasture contiguous to the pond turns his cattle in, and they wander from the pasture over the bottom of the old pond, such possession of the land made dry by the water receding as the dam lowered, would indicate that it was not adverse, but permissive.

2.  Open occupancy, to effectuate notice to the other party, is dependent on the nature and circumstances of such occupancy.

3.  The law is not the same as to alluvion, and land made dry in an artificial pond through the sinking of the dam.  The one is acquired through natural causes; the other, by adverse possession.

4.  *Plimpton* v. *Converse*, 42 Vt. 712, and 44 Vt. 158, approved and followed.

HEARD on the report of a referee at the September Term, 1879, DUNTON, J., presiding.  Judgment, *pro forma*, for the plaintiff. The defendant was the hired servant of one Mrs. Lippitt; and the alleged acts of trespass consisted of hauling and placing upon the land in question a lot of logs taken by the defendant out of an old mill dam, then owned by Mrs. Lippitt, and by her direction, which dam was being cleared away for the purpose of erecting another.  As to the abandonment of the land in question, and the gaining of it by adverse possession, the referee reported substantially as follows:  That at the time of the committing of the alleged acts, Mrs. Lippitt was the owner of the water power connected with the dam, unless she had lost it by non-user; that there had been a dam at this point for more than seventy years; that prior to, or about, 1835, it had been higher than since; that it then settled considerably; and that prior to about 1835, for a period of about fifteen years, when the pond was full and there was an average rise of water in the creek, the land in question was substantially flowed, excepting a thin, narrow strip on the bank of the creek, which strip widened as one approached the dam from the south, and in times of freshets this entire strip of land was flowed for comparatively brief periods; that it was not until

*Heard at the January Term, 1879.

1820, or later, that any land was visible when the pond was of average height at the point of the land in question; that gradually, from year to year, land came in view along on the bank of the creek, until in the course of ten years or thereabouts, there came to be at this point what was termed an "island." "From year to year more land came to view until about the year 1845, the bank of the creek at ordinary high water was visible, and land appeared when the pond was full." . . . . . . "Prior to 1835 or 1840, the land in question was principally covered with willows, especially along the margin of the creek, though further back from bank of creek there was some coarse grass and weeds. On some occasions prior to 1840, the grantors and ancestors of both the plaintiff and the said Mrs. Lippitt went upon this strip of land and cut and carried away grass, weeds and floodwood without any apparent conflict as to rights, the same then being of but little if any actual value. From year to year thereafter the willows, coarse grass and weeds gave way to better grass, until the same became what it now is—very good pasturage —only that the bank of the creek continues to be lined by willows, as is frequently the case against cultivated fields.

Formerly, and prior to about 1840, there was quite a so-called "swale" on the westerly side of this piece of land, and for a portion of the way it extended to the high land on the west. This was wider at the upper or south end of same, as well as deeper at that point; in ordinary high water the water flowed back from the dam to and into this "swale," from towards the west end of the dam, and along next to the high land on the west; this so called swale extended up to within about two rods of the margin of the bank of the creek on the south, and when the dam was full and water of average height the water set back or flowed therein from about 1835 to 1847. Formerly, and prior to 1835, and when the boundaries (of record) of the land in question as between the grantors and ancestors of the plaintiff and the said Mrs. Lippitt were the same, as when said alleged acts of trespass were committed, there was a fence running from the west end of the dam, up and along the base of the hill and margin of the pond, in an irregular line to the creek, striking and ending at creek. The evi-

dence submitted to the referee did not disclose who built this
fence, or when it was built.  About 1835, this fence was out of
repair, and the grantors of the said  Mrs. Lippitt undertook to
repair or rebuild this fence, and the grantor or ancestor of the
plaintiff objected to the rebuilding or repairing of said fence,
both parties then claiming to own the land to the east side of this
fence, and to adjust the adverse claims of the parties, the matter
was submitted (verbally, so far as it appears,) to the examination
and decision of a third party, who examined the matter and prac-
tically divided the disputed territory equally between the parties ;
deciding that so much of said land as was east of a line running from
the west end of dam in a southeast direction to a present visible point
or object, should belong to the grantors of the said Mrs. Lippitt, and
the land west of said line should belong to the plaintiff's grantors
or ancestors.  And the parties thereupon erected a fence across this
piece of land, along this new line ; but for some reason or cause not
apparent this fence remained standing for only one or two years,
and thereafter neither party paid any attention to this new line ;
and it does not appear that said agreement or decision as to said
new line of division or anything pertaining thereto was ever a
matter of record or ever reduced to writing.  From about 1838
or 1840, to the time the alleged acts of trespass were committed,
there was not any fence or pretence of a fence between the plain-
tiff's land on the west and the land in question, and the land in
question has been used and occupied by the plaintiff, his ancestors
and grantors, as a pasture, in connection with the pasture on the
west from about 1840 to 1857, during which time the land in
question was flowed, and from 1857 to the time of the committing
of said alleged acts of trespass (to wit: November, 1874,) with-
out any flowing of said land.  Occupancy of the land in question,
" from about 1840 to 1857," was made possible by the gradual
receding of the water, or making on of land ; and by reason of
absence of the fence, the cattle of the plaintiff, his grantors and
ancestors, ran over and pastured upon said land in connection
with the pasture on the west, and said possession or occupancy
was not otherwise hostile.  I do not find that there was any in-
terruption of said occupancy ; and find said land to have been so

occupied under a claim of right on the part of the plaintiff, and so far as it appears from the evidence submitted, said possession and occupancy have been without *manifest* objection from any one, at least since 1857, and open and noticeable to an observer. The then husband of the said Mrs. Lippitt (since deceased) owned said water power and privilege now owned by the said Mrs. Lippitt from October, 1849, to his decease in 1857, during which time said water power and privilege were in use, and the land in question flowed by him without objection from any one. After his decease said dam and its appurtenances ran down and went to decay, and practically there was not any flowing or setting back of water by or from said dam from 1857 to the time said alleged acts of trespass were committed.

From 1858 to September, 1860, said water power and privilege were owned by parties then residing in the immediate vicinity thereof. In September, 1860, said water power and privilege, in connection with other lands, were conveyed to the said Mrs. Lippitt, and she has ever since been the owner thereof, during which time she has resided in the State of New York, but spent a portion of each summer looking after her interests in the immediate vicinity of the premises in question. So far as the evidence discloses, the said Mrs. Lippitt has at all times supposed and believed that she owned the land in question, and it does not appear that either she or her grantors had any knowledge that the plaintiff, his ancestors or grantors, claimed to own the same, aside from the occasion and circumstances above stated in reference to the building of said fence from the west end of said dam.

It will be noticed by referring to the title deeds of the plaintiff, under which he claims the land in question, so far as it bears upon the same, that the descriptive words are as follows : " then southward across the highway on the west side of the carding machine privilege to the pond," (and this brings the plaintiff's easterly line to the west end of dam,) " then southerly on the edge of the pond to the northeast corner of John Eddy's land." By request of the parties to this suit, the referee submitted to the court the question : Do the title deeds of the plaintiff under which he claims title to the lands in question, vest the title to said land in the

30

plaintiff? And if not, has the possession and occupancy of said land by the plaintiff, his ancestors and grantors, been such as to give him title to said land as against the said Mrs. Lippitt, in view of the findings of the referee in the premises?

*J. C. Baker*, for plaintiff.

All accretions or alluvion formed to the land of the plaintiff, by which the waters of the pond receded to the east, belonged to the plaintiff, and his line continued to follow the receding waters. *Banks* v. *Ogden*, 2 Wall. 57; *Sanlet* v. *Shepherd*, 4 Wall. 502; *Halsey* v. *McCormick*, 18 N. Y. 147; *Newton* v. *Eddy*, 23 Vt. 319; 2 Hilliard on Real Prop. 195. The possession was open, notorious and exclusive. This makes his title perfect. *Whitney* v. *French et al.*, 25 Vt. 663; *Jakeway* v. *Barrett*, 38 Vt. 316; *Hodges* v. *Eddy*, 41 Vt. 485. The defendant was bound to take notice of the extent of the plaintiff's possession. *Burton* v. *Lazell*, 16 Vt. 158; *Clark* v. *Tabor*, 28 Vt. 222; *Arbuckle* v. *Ward*, 29 Vt. 43; *Child* v. *Kingsbury*, 46 Vt. 47; *Davis* v. *Judge*, 46 Vt. 655.

*W. G. Veazey* and *J. B. Phelps*, for defendant.

The single question in this case is, whether the occupancy by the plaintiff and his grantors has been such as to give him a possessory title.

We insist that it has not, because their possession was not hostile in its inception, nor exclusive. Tyler on Ejectment and Adverse Possession, p. 874, *et seq.*

As to its inception. It was only by cattle going on, and that is the only occupancy the plaintiff has ever had. It is plain that they were allowed on the pond because there was no object to keep them off. The taking off of flood-wood and weeds prior to 1840, amounts to nothing as an act of occupancy and was not hostile.

The plaintiff's occupancy was never exclusive, certainly while the dam was there; and if exclusive afterwards, it was only because the dam was gone, and when Mrs. Lippitt, having neither occasion to occupy or to keep others from occupying, did not know that the plaintiff was occupying.

The plaintiff got no title by adverse possession, because Mrs. Lippitt supposed she owned the land, and had no knowledge that the plaintiff or his ancestors or grantors claimed any title to the same. 4 Vt. 160 ; 2 Washb. Real Prop., marginal page, 489 ; *Coburn* v. *Hallis*, 3 Met. 125. Notice is not to be presumed by the court. *Coburn* v. *Hallis, supra* ; 2 Smith's Lead. Cases, pp. 469, *et seq.*

The opinion of the court was delivered by

BARRETT, J. The plaintiff must stand on his title—that on which he claims to be the owner of the land in dispute. His deed bounds him on the east contiguously to the land which Mrs. Lippitt claims that the deed to her husband conveyed to him, bounded on the west by the same line that bounds the plaintiff's land on the east, viz. : " then southerly on the edge of the pond to the northeast corner of John Eddy's land." That pond was in existence when the deeds defining said boundary were given. The deed to Lippitt gave him title to the pond—that is, to the line named. It gave him title to the land covered by the water, and to the edge of the pond as it then was. The going out of the dam and the sinking away of the water, as stated in the report, did not change the western boundary of what was covered by his deed, nor did it change the eastern boundary of plaintiff's land as described and conveyed by said deed to him.

This is not the case of a boundary by a stream, which may change by gradual washings and deposits. In this case the territory is limited by a defined boundary, without regard to the contingent subsidence of the water constituting the pond, and thereby leaving the land dry. The pond was an artificial creation as distinguished from the natural flow of a running stream. And not only the terms of the description, but the nature and reason of the case evinced the intent to fix a defined boundary of land, and give ownership to that boundary on both sides of it.

The plaintiff has not title by his deed. Has he by adverse possession ? We think not. The water of the pond, while the pond was there, rendered needless any fencing on the part of either party.

As the water receded, the defendant had no occasion to fence the land,—having no use for it, and leaving the receded water to do its office. The plaintiff did nothing but what he had been doing while the water was in the pond—viz., putting his cattle into his pasture contiguous to the water. As the water receded the cattle followed, for drink, shade, and cropping what might be in their way.

There was nothing to indicate to the defendant that plaintiff was asserting, or acting upon, a claim of right as against her, in reference to the swale, bushes, wild grass, &c., which succeeded the retirement of the water. As before said, the plaintiff did nothing but turn his cattle into his own pasture, and they wandered at " their own sweet will " on to the bottom of the old pond, without any act, or word on his part. If he had fenced it in, and put it to cultivation,—or if he had given out that he was occupying it, claiming to be the owner, so as to charge the defendant with knowledge of his claim,—if, indeed, his course in reference to it had been such as to indicate hostile claim, in his use of the land, he would have some ground for his claim of title by adverse possession. Instead of that being so, his occupancy was indicative of his understanding that it was permissive ; and every thing circumstantial indicates that the defendant regarded it in the same way, and he supposed she so regarded it.

Whether open occupancy operates notice to the other party that such occupancy is hostile, depends on the nature and circumstances of such occupancy. That subject is handled in the case of *Plimpton* v. *Converse*, 42 Vt. 712 ; *Same* v. *Same*, 44 Vt. 158, and what is held and said therein bears directly on the subject as it is involved in this case.

Mrs. Lippitt had no use for the land till she should want to cover it again with a pond, and had no occasion to give any attention to what was going on with it, by the plaintiff, or anybody else, and, least of all, would it indicate to her that the running of plaintiff's cattle on·it that were feeding in his pasture was a warning to her that plaintiff was claiming to own the land, and not merely enjoying a tacit permission which he had by

the fact that she did not fence him out, when she had no use for the land, and no occasion to do anything in respect to it, or even to take notice, in her summer visits, of the going upon it of the plaintiff's cattle.

Judgment reversed, and judgment for defendant.